IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CLEMMIE JOHNSON,

              Plaintiff,

    v.

CAPTAIN DUNAHAY,
SGT. TREVASKIS and
JOHN DOE,

              Defendants.

OPINION and ORDER

Case No.  17-cv-941-wmc

In this lawsuit, *pro se* plaintiff Clemmie Johnson is proceeding on Eighth Amendment claims against defendants -- Captain Erin Dunahay, Sergeant Donavan Trevaskis, and Sergeant John Doe -- who are all employees at Jackson Correctional Institution ("JCI").  In particular, Johnson claims that between September 7 and 13, 2017, he was placed in clinical observation, did not have access to toilet paper to clean himself, and was denied adequate clothing to keep warm.  He further claims that the named defendants responded to those conditions with deliberate indifference.  Currently before the court is defendants' motion for summary judgment (dkt. #35), as well as Johnson's motions to amend his complaint (dkt. ##44, 56) and for assistance in recruiting counsel (dkt. #45).  For the reasons that follow, the court will grant defendants' motion for summary judgment as to Sgt. Trevaskis, deny their motion as to Captain Dunahay, deny plaintiff's pending motions, and dismiss the Doe defendant for Johnson's failure to identify him timely.  Accordingly, this case will proceed to trial against Captain Dunahay on September 8, 2020, as currently scheduled.

UNDISPUTED FACTS[1]

A. Observation Status and Cells

As noted, all of Johnson's claims arise from his seven-day stay on "observation status" in Jackson's Restrictive Housing Unit.  Observation status is particularly restrictive and generally used to prevent prisoners from inflicting harm upon themselves or others. Under DAI Policy 500.70.24, prisoners on observation status are to be checked by unit staff at least every 15 minutes throughout the day and night.  Any requests or observations are also to be recorded by staff in a DOC-112 observation form.  Finally, psychological staff is to conduct daily rounds of prisoners on observation status for reassessment of their status.

The observation cells are sparsely furnished by design -- containing only a raised concrete bed, a sink and toilet -- to help insure prisoner safety.  When a prisoner is placed in observation status, any personal property that could be used to injure himself is also removed and the prisoner is given very limited property.  Pursuant to DAI Policy

---

[1] The court draws the following material facts from the parties' proposed findings and responses, along with the cited evidence of record.  While defendants object to numerous of Johnson's proposed findings of fact, as well as many of his responses to their proposed findings of fact, on the ground that the evidence Johnson cites does not support his assertion or on admissibility grounds, Johnson frequently cited to portions of defendants' own exhibits, which largely consist of records kept in the ordinary course of business *by defendants*.  So, it is unclear *why* the cited material is inadmissible.  Moreover, while Johnson did not submit a formal affidavit or declaration setting forth his own factual representations, he *did* sign his proposed findings of fact and his responses to defendants' proposed findings of fact under penalty of perjury, citing 28 U.S.C. § 1746.  This court is entitled to construe *pro se* submissions leniently, and it may overlook Johnson's noncompliance with the rules.  *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016).  Accordingly, for purposes of summary judgment, the court also accepts Johnson's factual averments within those submissions to the extent reasonably within his personal knowledge.  *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (accepting that a verified complaint "is also the equivalent of an affidavit for purposes of summary judgment").

500.70.24, however, prisoners may possess the following property items while on clinical observation status:  (a) suicide resistant clothing, such as a smock, gown or kilt; (b) a security mat/mattress; (c) bar or liquid soap and a washcloth; (d) bag meals; (e) toilet paper; (f) Health Service Request ("HSR") and Psychological Service Request ("PSR") forms; and (g) a crayon for completing forms.  While these items are available, the staff member actually placing the prisoner in observation status determines the property the prisoner will receive, based on that staff member's assessment of the prisoner's behavior and risk level at the time.

During their daily contact with prisoners on observation status, psychological staff are also to discuss the items of property the prisoner can possess, and psychological staff make determinations as to which property should be added or removed.  Although Psychological Services Unit ("PSU") staff make the final determination on requests for additional items, prisoners on observation status may make such requests through correctional officers working in that unit.  In particular, when a correctional officer receives a prisoner request for a certain item of property, the correctional officer must forward that request to his or her supervisor by policy.  The supervisor is then to reach out to PSU about the prisoner's request.  Finally, a PSU staff member is to conduct an in-person assessment of the prisoner to determine whether he may possess the requested item.

As to toilet paper in particular, defendants' position is that a single-use portion of toilet paper is always available to prisoners on observation status.  However, some prisoners are not allowed access to toilet paper because of security concerns and, therefore, have to request toilet paper when a correctional officer checks on them, which, again, is to occur

every 15 minutes.  Of course, prisoners without access to toilet paper may also request it from PSU staff during their routine visits to prisoners on observation status.

Prisoners may further request socks or a blanket once on observation status, although again PSU staff must approve the request.  According to defendants, PSU staff typically receive such requests via a phone call or email.  Otherwise, prisoners may make such requests directly during PSU staff's in-person screenings, which take place twice during each shift.

Finally, defendants' position is that the temperature in restrictive housing is set to 70 degrees.  Although temperatures in individual cells can vary, they represent that all cells maintain a 68-degree or higher temperature.  That said, when a prisoner complains about a cell temperature, a third-shift officer will conduct a temperature check at bed height at midnight.  If any adjustments need to be made based on that check, the Restrictive Housing captain is to call the maintenance supervisor.

## B.  Johnson's Placement on Observation Status

On September 7, 2017, Johnson went to the PSU to discuss how he was feeling with Ms. Brueggens, a PSU staff member who is not a defendant.  In particular, Johnson told Brueggens that he (1) was having thoughts of self-harm and (2) might harm others if he went back to his housing unit.  That day, Ms. Brueggens signed a form that acknowledged Johnson's thoughts of self-harm.  Additionally, that same day, Johnson tied one end of his bed sheets around the toilet and the other end around his neck, then was observed pushing off the toilet in an effort to strangle himself.  As a result, Johnson was placed on observation

status, where he was initially allowed to possess only a smock and security mat. It appears that Dunahay checked on him on the evening of September 7, 2017, and Johnson asked about his property. (*See* Ex. 1004 (dkt. #40-3) 17.)

At some point on September 7, 2013, Johnson passed a large amount of feces and diarrhea, which he says ran down his legs and got on his feet and smock, as well as the floor. As a result, Johnson discarded his smock and was naked and cold. Johnson claims that he had two subsequent bowel movements that he was unable to clean, but he does not specify when each occurred. From September 7 until September 13, 2017, Johnson claims that: (1) he remained naked; (2) his cell was "freezing" due to cold air constantly streaming from a vent in his cell; and (3) his repeated requests for socks, a blanket and toilet paper were all denied. More specifically, Johnson claims that on September 8, he asked Sergeant Trevaskis for socks, a blanket, and some toilet paper, telling Trevaskis that he was "freezing" and that he had feces all over his legs and the floor. (Johnson Resp. to Def. PFOF (dkt. #48) ¶ 24.) Johnson further claims that Trevaskis responded that he had to go through PSU.

Sergeant Trevaskis does not recall Johnson asking for socks and a blanket, and further comments that he would likely recall such a request because it would have been unusual and would have required permission from PSU staff. Trevaskis *does* recall denying Johnson's request for a toilet paper roll on September 8, 2017, although he points out that the DOC-112 did not include a note that Johnson made such a request. (*See* Ex. 1004 (dkt. #40-3) 30.) Regardless, according to Trevaskis, he denied the oral request because prisoners on observation status are not allowed a roll of toilet paper due to safety concerns,

but are instead only allowed a single use supply of toilet paper.  Moreover, while Trevaskis does not specifically recall Johnson asking for a single use supply of toilet paper that day, he generally would have granted such a request because a roll is generally located outside the observation cell.  Again, Johnson disputes this, insisting that he also asked for a single use supply and was similarly denied.

Johnson further claims that on September 8, he spoke with Captain Hottenstein, telling him he was cold and asking if someone from PSU would be coming to see him.  (*Id.*)  Johnson's observation log includes a September 8 entry by Dr. Hakes, with the time listed at 7:25 a.m., and a description that Johnson "refused to speak."  (*Id.* at 17.)  It does not appear that PSU staff visited Johnson's cell again that day.

On September 11, 2017, Captain Dunahay was working first shift (8:00 a.m. to 5:00 p.m.) in Jackson's observation unit.  Johnson claims that he spoke with Dunahay two times that day, again asking for toilet paper, socks and a blanket because he was extremely cold and shaking.  In particular, Johnson allegedly told defendant Dunahay that it was "freezing," and he had "feces all over" him, to which Dunahay reportedly replied that Johnson would need to go through PSU for anything, but in the meantime, he should walk around to release "good/happy hormones/feeling" in his brain.  (*See* Johnson PFOF (dkt. #49) ¶ 7.)

Captain Dunahay does not recall speaking to Johnson on September 11, and denies making any entries in Johnson's observation log that day.  Still, the observation log contains two entries from September 11 that list Dunahay as the visiting staff member at 10:29 a.m. and 2:35 p.m.  (Ex. 1004 (dkt. 40-3) 15.)  In particular, the 10:29 a.m. entry

noted that Johnson was standing at the door and "doing better," while the 2:35 p.m. entry noted that Johnson was standing at the door and "asked about seeing PSU." (*Id.*) Finally, Johnson claims that he spoke with Dr. Whithrow from PSU later on September 11, who had not heard about Johnson's requests for toilet paper, socks and a blanket. However, Whithrow allegedly told Johnson he would look into those requests, yet Johnson still never got any of those requested items.

As for temperature fluctuations, Johnson claims he asked PSU staff about the temperature on two occasions between September 7 and 13, but that no temperature check was ever conducted in his cell, in violation of policy. Defendants admit that no temperature check was performed in Johnson's cell during this time frame, but they dispute that Johnson ever complained about the temperature. Indeed, defendants argue that Johnson's cell temperature was never cold, providing the *outdoor* temperatures in Black River Falls between September 7 and September 13, 2017:

| Month/Day/Year | High of the Day | Low of the Day |
|---|---|---|
| September 7, 2017 | 64 | 40 |
| September 8, 2017 | 70 | 44 |
| September 9, 2017 | 76 | 36 |
| September 10, 2017 | 79 | 44 |
| September 11, 2017 | 81 | 41 |
| September 12, 2017 | 84 | 46 |
| September 13, 2017 | 85 | 48 |

Johnson does not dispute that these are accurate outdoor temperatures for those days, but notes that defendants did not provide the temperatures *inside* the Restrictive Housing Unit where he had been kept in an observation cell.

## OPINION

### I.    Motions to Amend (dkt. ##44, 56)

On March 10, 2020, Johnson filed a "Motion for Addendum," seeking to amend his complaint to include seven, additional defendants -- Captain Hottenstein, Sergeant K. Clark, Dr. Hakes, Dr. Whithrow, Ms. Brueggen, and Sergeant Lindow -- related to his claim that he was repeatedly denied toilet paper.  In fairness, one of the seven -- Sergeant Clark -- was apparently the "John Doe" defendant already named in his complaint as a proposed defendant.  Regardless, Johnson now alleges that each of these defendants were either involved in (1) allowing him to commit self-harm, or (2) failing to provide him toilet paper, socks or a blanket between September 7 and 13, 2017.

Generally, this court is to grant motions to amend freely as justice requires, but may deny leave to amend under Federal Rule of Civil Procedure 15(a) for undue delay, bad faith, undue prejudice to the opposing party, or futility.  *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004).  In this case, the court granted Johnson leave to proceed more than a year ago, advising him on March 11, 2019, specifically, that if Johnson wanted to proceed against the named Doe defendant, he would need to amend his complaint to identify this individual.  Magistrate Judge Crocker again advised in his June 28, 2019, preliminary pretrial conference order that "the longer you wait to amend, the less likely it

is that the court will allow you to amend." (Dkt. #22 at 6.) Yet wholly absent from Johnson's motion is any explanation for his failure to seek leave to identify the Doe defendant, much less to identify additional defendants to this lawsuit, for an entire year. What is worse, plaintiff did not even attempt to amend until almost two weeks *after* defendants filed their motion for summary judgment. Because adding new defendants at this late stage in the lawsuit would undoubtedly require additional discovery and a second round of summary judgment briefing, plaintiff's delay is both undue and prejudicial to defendants, who have been diligently litigating this case in accordance with the original trial schedule. Accordingly, the court will deny Johnson's motion to amend and dismiss the Doe defendant from this lawsuit.

## II.     Summary Judgment

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, the non-moving party must then provide evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). Moreover, at summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party, just as they were in the "UNDISPUTED FACTS" section above. Still, this treatment does not extend to inferences supported by only speculation or conjecture.

*Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

Defendants seek summary judgment in their favor on the merits of Johnson's Eighth Amendment claims, as well as qualified immunity grounds, but only defendant Trevaskis is entitled to judgment on this record.

### A.    Eighth Amendment

The Eighth Amendment entitles incarcerated persons to confinement under human conditions that provide for their "basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) (acknowledging that conditions of confinement may violate the Constitution in combination when together they produce the "deprivation of a single, identifiable human need"). This means that prisoners must receive adequate food, clothing, shelter and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

An Eighth Amendment "conditions of confinement" claim has two parts. First, the inmate must show that the alleged deprivation was "sufficiently serious" on an objective basis such that an official's act or omission results in the "denial of the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (*citing Farmer*, 511 U.S. at 834). For claims based on low cell temperature, for example, several objective factors may be relevant, including: "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such alternatives; as well as whether he must endure other uncomfortable conditions, as well as

10

cold." *Dixon v. Godinez*, 114 F.3d 640, 644 (7th Cir. 1997).  With respect to claims that a prisoner was subjected to unhygienic conditions, the court inquires into whether the prisoner had the ability to clean himself or his cell.   *See, e.g. Budd*, 711 F.3d at 842 ("[U]nhygienic conditions, when combined with the jail's failure to provide detainees with a way to clean for themselves with running water or other supplies, state a claim for relief[.]"); *Vinning-El v. Long*, 482 F.3d 923, 924 (7th Cir. 2007) (prisoner held in cell for three to six days with no working sink or toilet, floor covered with water, and walls smeared with blood and feces stated Eighth Amendment claim); *Isby v. Clark*, 100 F.3d 502, 505–06 (7th Cir. 1996) (prisoner held in segregation cell that allegedly was "filthy, with dried blood, feces, urine and food on the walls" stated Eighth Amendment claim); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (prisoner held in cell that allegedly was filthy and smelled of human waste, lacked adequate heating, contained dirty bedding, and had "rusted out" toilets, no toilet paper, and black worms in the drinking water stated Eighth Amendment claim).   Second, the inmate must show that the prison official acted with a subjectively culpable state of mind, known as "deliberate indifference" -- that is, the official knew about the adverse conditions, had the ability to prevent the harm, and failed to do so.  *See Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009).  Defendants seek judgment in their favor under both the subjective and objective prongs of Johnson's deliberate indifference claims.

### 1.    Objective Prong

Starting with the objective analysis, material factual disputes preclude judgment in defendants' favor.  Defendants' position is that the record does not support a reasonable conclusion that Johnson was subjected to conditions that fell below the minimal civilized measure of life's necessities, but that argument assumes as true *their* version of Johnson's conditions of confinement.  For one, defendants claim that it is undisputed that Johnson had access to toilet paper between September 7 and 13, because he had the ability to request toilet paper from any correctional officer or PSU staff member that passed by his cell.  However, Johnson attests that he did not have such access.  On the contrary, he maintains that even though he asked both Dunahay and Trevaskis (and other correctional officers) for toilet paper, no one provided it to him.  Further, while it appears that Johnson had access to his sink and running water during this time frame, it is undisputed that Johnson did not have soap or a towel, since the only property items Johnson was allowed as of his September 7 placement on observation status were the smock and security mat. (Ex. 1004 (dkt. #40-3) 1.)  If the lack of toilet paper were Johnson's only issue, defendants might be entitled to judgment in their favor, since the Seventh Circuit has held on multiple occasions that the lack of toilet paper for multiple days does not amount to a constitutional violation.  *Dye v. Lemon*, 40 F. App'x 993, 996-97 (7th Cir. 2002) (citing *Harris v. Fleming*, 839 F.2d 1232, 1234-36 (7th Cir. 1998) (lack of toilet paper for five days not cruel and unusual punishment)).  Yet that does not reflect the totality of Johnson's circumstances; he additionally claims that he was naked, freezing and denied socks or a blanket during this time frame.

To that point, defendants also argue that Johnson was not exposed to cold temperatures, citing evidence that:  (1) between September 7 and 13, the outdoor temperatures in Black River Falls were warm, at times reaching the mid-80's; and (2) as a matter of policy, the cell temperatures at Jackson do not fall below 68 degrees.  Even so, defendants concede that no temperature check was performed in Johnson's unit or his cell specifically, and they ignore the fact that the low temperatures outside each night ranged between 36 and 48 degrees.  Furthermore, Johnson attests that cold air was constantly coming out of a vent in the ceiling of his cell and claims he *did* complain about the temperature, but no one performed a cell temperature check.  Given that Johnson further attests that his cell was so cold that he was shaking uncontrollably, a genuine dispute of fact related to the actual temperature in his cell between September 7 and 13 remains.

Accordingly, the question becomes whether the totality of Johnson's circumstances permit a reasonable inference that Johnson was denied the minimal measure of life's necessities.  If a jury were to believe that Johnson (1) was naked, (2) had feces running down his leg with no toilet paper to wipe it off or soap to clean it off, (3) he was unable to clean his cell, and (4) did not have access to socks or a blanket in temperatures that fell into the 40s -- leaving him naked, dirty, shaking and cold for six straight nights, then this combination of factors *might* allow a reasonable jury to conclude that Johnson had been deprived of the minimal civilized measure of life's necessities.  *See Gillis v. Litscher*, 468 F.3d 488, (7th Cir. 2006) (genuine dispute of material fact as to prisoner's Eighth Amendment claim precluded summary judgment where plaintiff was kept completely

naked, all bedding was removed, prisoner was fed only "nutraloaf," in a cell kept at 70 degrees for five days).

Still, defendants' cite to a decision from this court, *Craven v. Mahoney*, No. 12-cv-524-wmc, 2014 WL 6473477, at *5 (W.D. Wis. Nov. 18, 2014), for the proposition that policies preventing prisoners from accessing unlimited toilet paper do not implicate Eighth Amendment rights. However, in *Craven*, the court addressed whether a policy limiting toilet paper and other hygiene items for security reasons could *by itself*, support an Eighth Amendment violation. *Id.* In that case, there was no dispute about whether prisoners were denied toilet paper *completely*; indeed, it was undisputed that the prisoners had the ability to ask for additional toilet paper and hygiene items. *Id.* Accordingly, the court concluded that the plaintiff's Eighth Amendment claim failed as a matter of law. *Id.* at 5.

In contrast, here, Johnson not only attests that he was denied access to *any* toilet paper for seven days, but that he was also naked, dirty and extremely cold. Thus, the *Craven* decision does not preclude a reasonable jury from finding that Johnson's circumstances *as a whole* met the objective element of his Eighth Amendment claims.

## 2. Subjective Prong

That leaves the subjective prong of the analysis -- whether defendants consciously disregarded Johnson's constitutionally infirm conditions of confinement. Trevaskis allegedly interacted with Johnson on September 8. Johnson says he told Trevaskis that he was "freezing" and had feces running all over his legs and the floor, but Trevaskis did nothing to address these conditions. While Trevaskis claims to have no memory of

Johnson reporting that he was cold or needed to clean up his feces, he concedes that Johnson made a request for toilet paper.  He also claims that he properly denied the request because Johnson wanted a *roll* of toilet paper, which prisoners on observation status may not possess for their own safety.  Still, Johnson insists that he asked Trevaskis for a single use portion of toilet paper, and that request was also denied.

Even accepting that Trevaskis denied him even a single use portion of toilet paper and failed to follow up with PSU staff about his other requests, however, the record does not support a reasonable finding of deliberate indifference to constitutionally infirm conditions of confinement.  As of September 8, Johnson had been on observation status for just one day.  Moreover, the observation log (and Johnson's averments) indicate that Johnson had been visited by correctional officers on a 15-minute basis up until he interacted with Trevaskis.  Further, the log shows that Dr. Hakes visited his cell at around 7 a.m. that morning.  Since Johnson claims that he had taken a bowel movement on September 7, and Dr. Hakes visited him the morning of September 8 -- before Trevaskis interacted with him -- Trevaskis could have reasonably concluded that Dr. Hakes and others at PSU had for some reason decided to deny Johnson's request to even a single use of toilet paper and any other property items, since those are decisions ultimately the responsibility of PSU anyway.  And even if Trevaskis thought Johnson was lying, and had actually soiled himself after seeing Dr. Hakes, Trevaskis's indifference to Johnson's situation for the hours before PSU's next visit, while negligent and perhaps grossly negligent, does not support an inference of deliberate indiffere4nce.  *See Pierson v. Hartly*, 391 F.3d 898, 902 (7th Cir. 2004) ("Negligence on the part of an official does not violate

the Constitution, and it is not enough that he or she should have known a risk.") (quoting *Haley v. Gross*, 86 F.3d 630, 641(7th Cir. 1996)).  Finally, no evidence of record suggests that Johnson told Trevaskis that he was unable to interact with PSU after seeing Dr. Hakes, nor that he could not have raised these concerns with Dr. Hakes when they had interacted that morning.  Regardless, at worst, Trevaskis acted indifferently in failing to provide Johnson a single use portion of toilet paper or to forward Johnson's requests for other items to PSU staff after being confronted with an individual who was naked and had soiled himself a few hours to 18 hours ago; his failure to do more at that juncture does not rise to an Eighth Amendment violation.  Accordingly, defendants are entitled to judgment in their favor as to Trevaskis.

As for Dunahay, however, her failure to alert someone in PSU to Johnson's conditions some three days later on September 11 may go beyond gross negligence and support an inference of deliberate indifference.  To start, Dunahay interacted with Johnson on the day of his placement, September 7.  While it is unclear from the record whether Johnson had gone to the bathroom on himself by that point, or informed Dunahay about his bowel movement and inability to clean himself, one might infer as much drawing every inference in Johnson's favor.  Even assuming Johnson had not, by the time of their interactions on September 11, Dunahay would have known that Johnson had been on observation status for four days.  While Dunahay cannot remember the details of her interaction with Johnson, he claims to have told Dunahay that he had been naked, soiled, distressed, living with filth and suffering unreasonably cold conditions; further, Johnson asked her for toilet paper and a means to clean up because he still had "feces all over" him

16

and the cell, as well as for socks and a blanket to stay warm at night.  Yet Dunahay allegedly responded that the things he was asking for had to come from PSU, telling Johnson in the meantime to "walk around his cell," ostensibly because it would release "good feelings" in his brain.  According to Johnson, Dunahay failed to pass on Johnson's request to any PSU staff members, and Dr. Whithrow apparently knew nothing of Johnson's requests.  Unlike Trevaskis, there is no suggestion in the record that PSU staff had visited Johnson recently and decided that it would be inappropriate to allow Johnson any additional property items.  Further, at that point in Johnson's stay in observation, he had gone four days without in allegedly freezing conditions, with no clothing and no ability to clean feces from himself or the floor of his cell.  Under these circumstances, a jury could reasonably infer that it would be obvious to Dunahay that other observation status staff either were responding to Johnson's requests with deliberate indifference or were, for whatever reason, unaware of his increasingly deplorable conditions, or so the court must find at summary judgment.  Accordingly, Dunahay's apparent failing to take *any* action to ameliorate the conditions of his confinement, could support a reasonable finding that Dunahay consciously disregarded the fact that Johnson had been living in cold, filthy conditions.

Defendants suggest that it would unreasonable to infer deliberate indifference by either defendant based on the observation log entries.  In particular, defendants argue the court should deem undisputed the log entries related to Johnson's observation status, including the entry by non-defendant correctional officers who wrote on September 11, 2017, that Johnson was talking to PSU staff and "doing good."  (*See* dkt. #43-3, at 51, 53.)  Yet Johnson again disputes that he made such statements; rather, he insists that he

explicitly reported his severe discomfort and need to clean himself to each defendant.[2]  As such, factual disputes remain with respect to exactly what Johnson told Dunahay.

Defendants also rely on a decision by our sister court, which held that denying a prisoner a mattress did not violate his Eighth Amendment rights because there was an undisputed concern that the prisoner would use it to commit an act of self-harm.  *Bowers v. Pollard*, 602 F. Supp. 2d 977, 993 (E.D. Wis. 2009), aff'd, 345 F. App'x 191, 14 *4 (7th Cir. 2009).  However, in *Bowers*, the plaintiff had initially been given access to a mattress while he was in segregation, and defendants only decided to take his mattress and other materials away from him *after* that plaintiff started tearing up the mattress and attempting to harm himself with it.  *Id.* at 988-89.  "Under the [specific] circumstances of th[at] case," therefore, the court found "the conditions imposed were not so much punishment as a means of protecting the inmate himself." *Id.*

For the same reasons, this decision is not particularly helpful to Dunahay.  To start, Dunahay does not attest to making a judgment call about whether providing Johnson socks or a blanket would allow him to harm himself.  There is also no record of a PSU staff member meeting with Johnson earlier that day (or any other day after September 8)

---

[2] Defendants maintain that since Johnson's assertions are "consistently contradicted by evidentiary records," the court should find no genuine dispute, arguing that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should  not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  However, that principle does not apply here, since the clinical observation record is far from irrefutable; if anything, a reasonable fact-finder could just as easily conclude that the clinical observation log was inaccurate as opposed to Johnson's recollection.  Essentially, defendants ask that the court accept their evidence about Johnson's experience on clinical observation status as the correct version, but to do so would require a credibility determination, which is inappropriate at this stage. *Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008).

determining that Johnson *should* be denied these property items out of concern over self-harm.  Furthermore, there is no record suggesting that there continued to be a need to deny Johnson the requested items.  Specifically, although it is undisputed that Johnson attempted self-harm *before* his placement in observation status, it is also undisputed that prisoners may ask correctional officers for additional property items, who then forward those requests to PSU staff.  This policy suggests that even though a prisoner may continue to pose a risk to himself that requires observation, an improvement in mood or behavior may allow the prisoner access to additional property.  In Johnson's circumstances, there is no record that Johnson continued to pose a threat to himself, such that Dunahay could deny his requests for socks, a blanket or toilet paper, without first passing on Johnson's requests to PSU for consideration.  Accordingly, Dunahay is not entitled to judgment in her favor based because those items were denied to protect Johnson from himself.

Defendants would also argue that Dunahay cannot be held accountable for her failure to provide Johnson toilet paper or other items because she was not just entitled to defer to the decisions by PSU restricting Johnson's access to additional property items, but required to do so.  *See Leiser v. Kloth*, 933 F.3d 696 (7th Cir. 2019) (citing *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (non-medical personnel are entitled to assume "a treating physician would have ordered an accommodation if one was necessary").  Although Trevaskis would be entitled to that deference given the timing of his interaction with Johnson, Dunahay is not.  For one, the court in *Leiser* only held that a correctional officer was obliged to take as true a prisoner's assertion that he suffered from Post-Traumatic Stress Disorder, absent such a diagnosis from a physician or psychologist.  *Id.* at 704-05.

Similarly, defendants also cite to *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010), for the proposition that "it would be unwise to require more of a nonmedical staff member," since "the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments." *Id*. at 440.  However, such deference is a *general* rule, *Leiser*, 604 F.3d at 705, *Berry*, 604 F.3d at 440, and non-medical personnel are *not* allowed to *ignore* prisoners' needs by blindly deferring to a health care professional's supposed judgment.  *See Berry*, 604 F.3d at 440 (nonmedical administrator was entitled to defer to healthcare professionals because he consulted with medical staff, forwarded the prisoners' concerns to the DOC and responded to the prisoners complaints); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants cannot simply ignore an inmate's plight.") (citations omitted).

Here, the evidence of record does not establish that Dunahay actually deferred to PSU staff in handling Johnson's specific requests for socks, a blanket or toilet paper.  By defendants' own account, when a prisoner on observation status asks a correctional officer for additional property, the correctional officer is to forward that request to his or her supervisor, who then contacts PSU.  Given that correctional officers are involved in the 15-minute checks of prisoners on observation status, defendants cannot reasonably take the position that Dunahay could continually defer to the initial property decisions made by PSU at the start of a prisoner's placement on observation status.  In any event, since Johnson claims Dunahay failed to take *any* action with respect to his requests for toilet paper, a blanket and socks, and the undisputed record indicates that she was obliged to

20

forward his requests to their supervisor, she cannot shield herself from liability on the ground that PSU had not approved him for additional property items.

The bottom line is that if a jury were to believe Johnson, it could reasonably conclude that from September 7 to 13 of 2017, he was left in a cell naked, shaking uncontrollably from the cold, and unable to clean himself, despite having feces on his leg and the floor of his cell.  And while Trevaskis's alleged failure to follow up on or grant Johnson's September 8 requests may not amount to deliberate indifference, Dunahay's September 11 interactions with Johnson may support such an inference.  Accordingly, the court is granting defendants' motion for summary judgment as to Trevaskis, but denying it on the merits as to Dunahay.

### B.    Qualified Immunity

Nor is Dunahay entitled to judgment on qualified immunity grounds.  "Qualified immunity protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)).  The inquiry is two-fold:  "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation."  *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

Whether a right was "clearly established" is grounded in the notion of fair notice. Thus "[a] rule is too general if the lawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *District of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 199 L. Ed.2d 453 (2018) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034 (1987)).  The Court of Appeals for the Seventh Circuit recently reminded courts that "clearly established law cannot be framed at a 'high level of generality.'" *Campbell*, 936 F.3d at 545 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 742, 131 S. Ct. 2074 (2011)).  Rather, "[e]xisting caselaw must dictate the resolution of the parties' dispute," meaning that the "precedent must have placed the . . . constitutional question beyond debate.'" *Campbell*, 936 F.3d at 545 (citations omitted). Accordingly, courts must "[f]rame the constitutional right in terms granular enough to provide fair notice." *Id.*

Dunahay points to the Seventh Circuit's decision in *Henderson v. DeRobertis*, 940 F.2d 1055 (7th Cir. 1991), in which the court concluded that prison officials were not entitled to qualified immunity when, for a four-day period, the prison's heating system did not work and the outdoor temperature fell to a low of 22 degrees below zero.  Defendants argue that this decision makes it beyond debate that Johnson's circumstances -- in which the temperature in his cell was at least 68 degrees -- did not violate his constitutional rights. In making this argument, however, defendants again ignore Johnson's claimed inability to clean himself or get any toilet paper, and assume that their evidence about the temperature Johnson experienced is the more credible.  The court has already concluded that is a

disputed matter of fact for the trier of fact.  Accordingly, Dunahay is not entitled to judgment in her favor on qualified immunity grounds.

## III.    Motion for Assistance in Recruiting Counsel (dkt. #45)

Finally, Johnson filed a motion for assistance in recruiting counsel, explaining that he is not an expert in the law, has limited access to the law library, and lack the abilities necessary to try this case before a jury.  Civil litigants have no constitutional or statutory right to the appointment of counsel.  *E.g.*, *Ray v. Wexford Health Sources, Inc.,* 706 F.3d 864, 866 (7th Cir. 2013); *Luttrell v. Nickel,* 129 F.3d 933, 936 (7th Cir. 1997).  The court may, however, use its discretion to determine whether to help recruit counsel to assist an eligible plaintiff who proceeds under the federal indigent statute.  *See* 28 U.S.C. § 1915(e)(1) ("The court may request an attorney to represent an indigent civil litigant *pro bono* publico.")

Before deciding whether to recruit counsel, however, a court must find that the plaintiff has made reasonable efforts to find a lawyer on his own and has been unsuccessful.  *Jackson v. County of McLean*, 953 F.2d 1070, 1072-73 (7th Cir. 1992).  To date, Johnson has not shown that he made *reasonable* efforts to recruit an attorney on his own.  At most, he represents that he "has made repeated efforts to obtain a lawyer," but this court requires a party seeking recruitment of counsel to provide more specific evidence to support that representation, such as (1) letters from three attorneys declining to represent him, or (2) a declaration, signed under penalty of perjury, attesting to the names of the attorneys that have not responded to his specific requests for representation.  Since Johnson makes neither showing, his motion may be denied on that basis alone.

Even more important, Johnson's filings in this lawsuit -- in particular, his success in partially defeating defendants' motion for summary judgment -- suggests he is capable of meeting the demands of a trial. The central question is "whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Pruitt v. Mote*, 503 F.3d 647, 655 (7th Cir. 2007). Johnson has already demonstrated that he is familiar with the events comprising his claims in this lawsuit, as well as the applicable legal standards. He also submitted his own proposed findings of fact, along with supporting documentary evidence, and although his submissions did not follow this court's procedures for responding to motions for summary judgment, Johnson was able to submit his version of the events in question, sworn under penalty of perjury, which was all that was necessary for the court to evaluate whether the record could allow a reasonable trier of fact to find in his favor. Finally, Johnson's submissions were adequate to defeat defendants' motion in part.

The fact that this case is proceeding to trial does not change Johnson's demonstrated ability to litigate this case, at least on the record now before this court. For one, as illustrated by the court's resolution of defendants' summary judgment motion, this case largely involves factual disputes related to (1) the exact conditions Johnson faced on observation status, and (2) the interactions between Johnson and defendants. Johnson appears fully capable of testifying to his experiences and questioning Dunahay about those events. Although trial logistics can be intimidating and complex, the court will shortly issue a "Trial Preparation Order" that describes, step-by-step, how the trial will proceed, and the resources that Johnson should use in preparing adequately for trial. The order will

24

also set out the applicable legal standards and relevant deadlines the parties must meet leading up to trial. At this point, the court's impression of Johnson suggests that he does not need an attorney to review and apply the guidance set forth in that order. That said, the court may *sua sponte* decide to recruit counsel for Johnson after reviewing his pretrial submissions. Accordingly, the court will deny Johnson's motion for assistance in recruiting counsel without prejudice.

## ORDER

IT IS ORDERED that:

1. Defendant John Doe is DISMISSED.

2. Defendants' motion for summary judgment (dkt. #35) is GRANTED in part and DENIED. The motion is GRANTED as to defendant Trevaskis, and DENIED as to Dunahay.

3. Plaintiff Clemmie Johnson's motions to amend (dkt. ##44, 56) are DENIED.

4. Plaintiff's motion for assistance in recruiting counsel (dkt. #45) is DENIED without prejudice.

5. Defendants' motion to stay (dkt. #57) is DENIED.

Entered this 20th day of July, 2020.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge